UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Christopher L. Orkins,            :
                                  :
       Plaintiff,                 :
                                  :
       v.                         :   File No. 1:09-cv-237-jgm
                                  :
Edward Dumas, Jason               :
Johnson, Officer Post,            :
Officer Tarbell, Officer          :
Prouty, Officer Gorruso,          :
City of Rutland,                  :
                                  :
       Defendants.                :

OPINION AND ORDER
(Doc. 63)

Plaintiff Christopher Orkins, proceeding *pro se*, brings this action claiming he was beaten by members of the Rutland Police Department. He alleges this conduct constituted excessive force in violation of the Fourth Amendment, and battery under state law. Defendants have moved for summary judgment on all claims. For the reasons set forth below, Defendants' motion (Doc. 63) is GRANTED and this case is DISMISSED.

Factual Background

The following facts are undisputed unless otherwise indicated. On the night of October 20, 2006, there was a social gathering at Orkins' apartment in Rutland, Vermont. At approximately 1:00 a.m., Orkins and his friend, David Blanchard, left the gathering and went to a nearby bar. According to Orkins' deposition testimony, he had two beers while at the bar.

(Doc. 63-3 at 19.) He may also have used marijuana that night. Id. at 56.

Orkins and Blanchard subsequently left the bar and returned to Orkins' home. Orkins went into his bedroom, and was later told that Blanchard had punched a woman named Megan Muir. Orkins contends that Muir was his girlfriend at the time. Orkins exited the bedroom, saw Blanchard leaving the party, and ran after him.

Orkins caught up with Blanchard at a Jiffy Mart approximately 100 feet from his apartment. He grabbed Blanchard's coat, but Blanchard slipped out of the coat and ran down the street. Blanchard then called 9-1-1 and reported that he was being assaulted. While Blanchard was calling for help, Orkins walked to a laundromat parking lot across the street from the Jiffy Mart and left Blanchard's coat there so that it could be retrieved.

Rutland Police Officers Matthew Prouty and Robert Gorruso responded to the 9-1-1 call. While Officer Prouty attests in an affidavit that he spoke with Orkins, (Doc. 63-6 at 1), Orkins denies having spoken to a police officer. (Doc. 63-2 at 4.) Both officers attest that because they believed the incident had concluded, they allowed the two men to leave the area rather than be placed under arrest. (Doc. 63-6 at 2); (Doc. 63-7 at 2.)

Orkins alleges that after leaving Blanchard's jacket in the parking lot, he walked back to his apartment. When he arrived at

2

the apartment, a police officer was standing in the front walkway. (Doc. 63-3 at 30-32.) As Orkins testified in his deposition:

> When I got past the streetlight I looked up, um, he didn't say nothing to me. And then I got tapped or clobbered on my head and fell to the ground. And then I looked back and I saw [Rutland Police Officer Edward] Dumas, and then, um, then I saw nothing but feet and hands from all directions. And then I fell to the ground again and, ah, was knocked unconscious. And then I picked my face up off, off the ground like this (indicating), and I looked back and I could see all the officers walking back to their cars or walking down Pine Street towards [the] Jiffy Mart area.

Id. at 32.

Orkins now claims that several police officers were involved in the alleged assault. He believes they were police officers because the person standing in the walkway was uniformed, and because the men walking away wore black clothing and boots. Id. at 50-51. Aside from the officer in the walkway and Officer Dumas, Orkins did not see the faces of his assailants. Id. at 41-42.

Although his deposition testimony referred to police "walking back to their cars," Orkins did not actually see marked police cars in the area. Id. at 32, 44. Nor did he see other signs – such as police badges, patches, radios or firearms – to indicate his attackers were police. Id. at 51, 57. Orkins does contend, based on his injury, that the initial blow was inflicted by a Mag-Lite flashlight. Id. at 36, 37.

3

With respect to the specific officers allegedly involved, Orkins believes the officer in the walkway was Officer Gorruso. He did not know who Officer Gorruso was at the time. Id. at 33. He later obtained a description of Officer Gorruso, and was informed that Gorruso drives a black truck. Orkins alleges that he saw an unmarked black truck at the scene, and has identified Officer Gorruso on this basis.

> Q: So you identified Officer Garusso [sic] based upon --
> A: From a description.
> Q: -- a description that was provided to you?
> A: In that he was the one that drives the black, um, truck. But before that I did not know who he was.

Id. at 34.

Officer Gorruso has submitted an affidavit stating that he does not believe he "ever stood in the walkway of what has been described as the Plaintiff's apartment," and that he did not "kick, punch, or otherwise assault . . . [or] observe anyone else kicking, punching or otherwise assaulting the Plaintiff." (Doc. 63-7 at 2.) Defendants have also submitted an affidavit stating that the Rutland Police Department had only one vehicle in October 2006 that meets the description of the truck Orkins allegedly saw that night. (Doc. 63-12 at 2.) The vehicle was a Chevy Tahoe and was used strictly for commercial vehicle enforcement. Id. According to the affidavit of Rutland Police Lieutenant Kevin Geno, "Officer Gorruso would not have been

4

operating the Tahoe at the time of the events that are described by the Plaintiff." Id.

Orkins further claims Officer Dumas is the person who struck him initially. Id. at 35, 41-42. Officer Dumas has submitted an affidavit stating he was off-duty, was at home asleep at the time, and did not "witness any of the alleged events described by Plaintiff." (Doc. 63-8 at 1-2.) Lieutenant Geno's affidavit confirms Officer Dumas was not on duty that night. (Doc. 63-12 at 1.)

Orkins conceded in his deposition he cannot confirm the involvement of Officers Johnson, Post, Tarbell or Prouty, all of whom have been named as Defendants. (Doc. 63-3 at 54-55.) Orkins explains he named Officer Johnson as a Defendant because he has seen Johnson wearing gloves, and he believes one of the people involved in the assault hit him with "sand gloves." (Doc. 63-3 at 43, 54.) Orkins also describes Johnson as "very heavyset," weighing "270 maybe." Id. at 53. Officer Johnson's affidavit states that he weighed 175 pounds in October 2006, and that he does not wear "black riot/sand gloves or gloves with a rough texture." (Doc. 63-9 at 1.) Officer Johnson further swears that, although he was working that night, he did not have any contact with Orkins. Id. at 2.

Officer Post was also working that night, but he too has submitted an affidavit stating that he did not have any contact

5

with Orkins. (Doc. 63-10 at 1.) Officer Post further attests that he did not observe Officer Dumas or Sergeant Tarbell, "as they were not assigned to work that day." Id. Sergeant Tarbell has submitted his own affidavit testifying to his schedule, and the fact that he was not on duty during the period of time in question. (Doc. 63-11.)

The two police officers who responded to Blanchard's 9-1-1 call, Officers Gorruso and Prouty, dispute Orkins' account of that evening's events. As noted above, Officer Gorruso states he did not stand in the walkway of Orkins' apartment, did not assault Orkins, and did not witness an assault. (Doc. 63-7 at 2.) Officer Prouty states he spoke with Orkins briefly, but did not observe or take part in an assault. (Doc. 63-6 at 1-2.) Mr. Blanchard also testified in a deposition that he did not see any sort of altercation. (Doc. 63-4 at 10.) The officers attest they spent less than ten minutes responding to the 9-1-1 call before going back on patrol. (Doc. 63-6 at 2.); (Doc. 63-7 at 2.)

Orkins claims that within an hour of being assaulted, he went to the emergency room at Rutland Regional Medical Center, arriving at approximately 4:30 a.m. (Doc. 63-3 at 15.) He reports that on the way to the hospital, he held a washcloth to his head wound, and that the cloth was filled with blood when he arrived. Id. at 4-6. The wound continued to bleed thereafter,

"[b]ut not as profusely." Id. at 6. Orkins also claims to have suffered multiple head contusions, a swollen right hand, facial abrasions, vision problems in both eyes, and a lump in the area of one temple. Id. at 3-4, 7-9, 11. He testified in his deposition that he was provided intravenous pain medication as part of his treatment. Id. at 9.

Hospital records indicate Orkins did not arrive at the hospital until 1:40 p.m. in the afternoon following the alleged assault. (Doc. 63-13 at 12-13.) In his discussions with the triage nurse, he reportedly complained of lumps on his head, swollen hands and skinned knees. He claimed he had been hit from behind at approximately 3:30 a.m., and requested a "note for work." Id. at 5-6. There is no indication in the medical records of a laceration on the top of his head, or of any intravenous medication. (Doc. 63-14 at 8.)

Although not supported by the hospital records, Orkins' claim of head wound finds limited support in the deposition testimony of Megan Muir. Muir testified that she attended the gathering at Orkins' apartment on the evening in question, and was aware of an altercation between Orkins and Blanchard. (Doc. 63-15 at 8.) She also testified she saw Orkins standing with police officers, after which Orkins returned to "the apartment bawling, saying the police beat him up. I mean he had a cut on his head, a gash . . . . It was bleeding a little bit when he

7

came up, but I don't think it bled that long." Id. at 12, 14, 16. Muir further testified she took Orkins to the hospital the following afternoon. Id. at 17.

When asked at her deposition whether she had seen police officers immediately in front of Orkins' apartment, Muir stated she had not. Id. at 14. She also reported that in a subsequent conversation with Mr. Blanchard, Blanchard claimed it was he, and not the police, who had beaten Orkins that night. Id. at 22.[1]

## Discussion

Summary judgment is appropriate when, construing the evidence in the light most favorable to the non-moving party, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" for these purposes when it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

It is well established that "[a] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a genuine

---

[1] The Court finds that Blanchard's statement to Muir would be admissible under Fed. R. Evid. 804(b)(3).

issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Only disputes over material facts — "facts that might affect the outcome of the suit under the governing law" — will properly preclude the entry of summary judgment. Anderson, 477 U.S. at 248; see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (stating that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").

In this case, Defendants acknowledge there are disputes of material fact, particularly with respect to the identities of the individuals involved in Orkins' alleged assault. They contend, however, that "the Plaintiff's version of [the] facts is so fanciful, given the known record, that no reasonable jury could believe the Plaintiff's version of events." (Doc. 63-1 at 7.)

In Anderson, the Supreme Court held that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." 477 U.S. at 252. In other words, "the judge must ask . . . not whether the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." Id.

Although a district court generally "should not weigh evidence or assess the credibility of witnesses," Hayes v. N.Y. City Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996), the Second Circuit has held that

> in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' . . . and thus whether there are any 'genuine' issues of material fact, without making some assessment of the plaintiff's account.

Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005) (quoting Anderson, 477 U.S. at 252). More recently, in Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98 (2d Cir. 2011), the Second Circuit explained:

> we do not suggest that district courts should routinely engage in searching, skeptical analyses of parties' testimony in opposition to summary judgment. . . . However, in certain extraordinary cases, where "the facts alleged are so contradictory that doubt is cast upon their plausibility, the court may pierce the veil of the complaint's factual allegations and dismiss the claim." [Jeffreys, 426 F.3d] at 555 (internal quotation marks and alteration omitted). To hold otherwise, and require district courts to allow parties to defeat summary judgment simply by testifying to the allegations in their pleadings (or, as here, to facts *not* alleged in their pleadings), would "license the mendacious to seek windfalls in the litigation lottery." Arrington v. United States, 473 F.3d 329, 344 (D.C. Cir. 2006) (Brown, J., concurring in part and dissenting in part).

Rojas, 660 F.3d at 106. Similarly, the U.S. Supreme Court has opined that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no

10

reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  Scott v. Harris, 550 U.S. 372, 380 (2007).

In this case, viewing the facts in a light most favorable to Orkins, the Court concludes that while there are disputed facts, the disputes are not genuine.  The Court begins its analysis with Officer Dumas.  Orkins claims that while returning home from a bar, he saw a police officer in front of his home and was then immediately hit over the head with a heavy object.  He fell to the ground, "was knocked unconscious for a split second," and was able to briefly identify Officer Dumas as the person who had inflicted the blow.  (Doc. 63-3 at 35, 37-38, 41).

Officer Dumas attests in his affidavit that he was at home in bed at the time of the alleged attack.  Specifically, he states that he ended his shift at 10:40 p.m. on the night of October 20, 2006.  After arriving home, he spoke with his wife, watched television, and went to bed.  He reportedly remained in bed until he awoke at 7:00 a.m. the next morning.  (Doc. 63-8 at 1-2.)

Orkins' response to the summary judgment motion (Doc. 73) does not refute Officer Dumas's affidavit testimony.  In fact, the response does not mention Officer Dumas at all.  In contrast, the officers who were present that night have sworn that they did not see Officer Dumas, and the Rutland Police Department, through

Lieutenant Geno's affidavit, has confirmed that Officer Dumas ended his shift several hours before the alleged attack.

Like the allegations levied by the plaintiff in Jeffreys, Orkins' claim against Officer Dumas is "largely unsubstantiated by any other direct evidence." 426 F.3d at 555. Moreover, it is countered by the detailed affidavits of several other individuals. As discussed above, the Court is aware of its obligation to avoid credibility determinations. However, the Court also finds that Orkins' claims are extraordinarily unsupported. Indeed, given the overwhelming evidence running counter to Orkins' account, the Court finds that it must "pierce the veil of the complaint's factual allegations," and in doing so, concludes that no reasonable juror could find in Orkins' favor on his allegation that he was attacked by Officer Dumas. Jeffreys, 426 F.3d at 555. Officer Dumas is therefore entitled to summary judgment.

The allegations against the remaining officers are similarly unsupported. Orkins concedes that, with the exceptions of Officers Dumas and Gorruso, he only saw his alleged assailants from the back. He also admits that he did not witness them wearing guns, radios, or other indicia of law enforcement. His sole bases for naming these officers as his attackers are (1) Officer Gorruso was allegedly standing in the apartment walkway

immediately prior to the attack, and (2) his attackers wore black clothing and boots. (Doc. 63-3 at 50-51.)

Orkins claims Officer Johnson was present because one of the attackers allegedly wore "sand gloves." He believes that, on more than one occasion, he has seen Officer Johnson wearing gloves. Id. at 52. He also describes Officer Johnson as weighing 270 pounds. Officer Johnson states in his affidavit that he weighed 175 pounds on the night in question, that he continues to weigh significantly less than 270 pounds, and that he does not wear sand gloves. (Doc. 63-9 at 1.)

Officer Prouty responded to the 9-1-1 call, and recalls speaking with Orkins. Orkins denies having spoken to a police officer. This dispute is immaterial, as it does not alter the fact that Orkins cannot identify Prouty as one of his attackers. Nor can he testify that Officer Post, who was on duty with Officer Johnson at the time, participated in the alleged assault. Both Prouty and Post have submitted affidavits denying any involvement. (Docs. 63-6, 63-10.)

Sergeant Tarbell is also named as an attacker, although, like Officer Dumas, his affidavit states he was not on duty at the time. He also swears he was not involved in any alleged attack upon Orkins. (Doc. 63-11.) Consequently, aside from Orkins' claims that he saw Officers Dumas and Gorruso, he offers

little beyond guesswork to place the Defendants at the scene, and his conjecture is countered by specific affidavits and denials.

As to Officer Gorruso, Orkins did not know Gorruso previously, but was later provided a description and told that Gorruso drives a black police truck. Lieutenant Geno reports Officer Gorruso would not have been operating the Rutland Police Department's truck during the time in question. (Doc. 63-12 at 2.) And as with the other officers, Officer Gorruso has submitted an affidavit denying that he either participated in, or witnessed, an attack. (Doc. 63-7 at 2.)

Finally, the medical evidence does not support Orkins' claims that he suffered a serious blow from a large object. Indeed, there is no documentation of the sort of wound Orkins claims to have suffered on the top of his head. Nor is there evidence to support his claim that he required immediate medical attention, arriving at the hospital with a washcloth covered in blood and in such discomfort that he required intravenous pain medication. Instead, the medical records indicate Orkins reported to the hospital the following afternoon complaining of bumps and abrasions, and asking for a note for his employer. Megan Muir's deposition corroborates these records, both with respect to the timing of Orkins' hospital visit and the extent of his injuries.

In his response to the summary judgment motion, Orkins posits that there is a seven-minute gap between the arrival of police at the scene, and their eventual conversation with Mr. Blanchard. He alleges this period of time "gives the officers plenty of time (7 mins) to attack me and leave." (Doc. 73 at 4.) Orkins also notes Blanchard would not have seen the attack, as he had walked out of sight of Orkins' apartment. Id. at 6.

Orkins further claims there is a factual dispute about whether he and Blanchard were together when the police arrived. Even assuming such a dispute, the issue is immaterial. Whether the men were together or apart while police were present, the fundamental question is whether a group of police officers, some of whom were off duty, attacked Orkins in front of his home. The record in this case simply does not provide enough evidence for a reasonable juror to find in Orkins' favor on this question.

Indeed, Orkins relies upon little more than speculation and conjecture to support his claims. Most significantly, his identification testimony is incomplete. He saw most of his assailants from behind. With respect to his two affirmative identifications, he has identified Officer Gorruso based upon the presence of a truck, and Officer Dumas on a split-second sighting. To the extent there is any additional evidence, such as the testimony of other officers, witnesses, and hospital

medical records, that evidence reinforces the Defendants' accounts.

In Jeffreys, the plaintiff alleged a group of police officers beat him and threw him out of a third-floor window. 426 F.3d at 551. His allegations were not only inconsistent with statements he had made previously, but were also countered by police testimony. Id. at 551-52. Moreover, and as in this case, the medical evidence did not support plaintiff's claim that he had been struck in the head by a police officer wielding a flashlight. Confronted with such a record, the Jeffreys court concluded it would require a "suspension of disbelief" for a jury to credit the plaintiff's allegations. 426 F.3d at 555.

In this case, the notion is that Orkins was beaten by police officers outside of his house in the middle of the night while others were present inside the home. The non-police officer eyewitnesses, Megan Muir and David Blanchard, each testified they did not see any police officers in front of the house. Muir also testified that, according to Blanchard, it was he and not the police who had caused Orkins' injuries.

In sum, Orkins offers barely a "scintilla of evidence" to support his claim that the six officers named in the Complaint beat him up outside of his home on the night in question. Anderson, 477 U.S. at 252. Accordingly, the Court finds this is an extraordinary case in which disputes of fact exist and yet,

given the record, Defendants are entitled to judgment in their favor as a matter of law. See, e.g., McMahon v. Fura, 2011 WL 6739517, at *10 (N.D.N.Y. Dec. 23, 2011) (granting summary judgment to defendants where plaintiff claimed he "must have" been tased by "an officer," and claim was countered by testimony of only officer present with a taser); Torres v. Caron, 2009 WL 5216956, at *8 (N.D.N.Y. Dec. 30, 2009) (noting that Jeffreys exception is most applicable where plaintiff's version of events is contradicted by defense testimony). Their motion for summary judgment is therefore GRANTED.

## Conclusion

For the reasons set forth above, Defendants' motion for summary judgment (Doc. 63) is GRANTED, and this case is DISMISSED.

SO ORDERED.

Dated at Brattleboro, in the District of Vermont, this 9th day of March, 2012.

/s/ J. Garvan Murtha
J. Garvan Murtha
United States District Judge